# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

MELISSA CUDWORTH on behalf of KD,

§
§
§

   *Plaintiff,*

§
§

*versus*

§   CIVIL ACTION NO. 8:13-361
§

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

§
§
§
§

   *Defendant.*

§
§
§

## REPORT AND RECOMMENDATION

  Melissa Cudworth ("Cudworth"), invoking subject-matter jurisdiction under 42 U.S.C. § 405(g), appeals from the denial of her application for supplemental security income, filed on behalf of her minor child, "KD."[1]

## I. Judicial Review

  A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither

---

[1]   In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure and 8.1 of the Local Rules for the Northern District of New York, the minor in whose behalf the application was filed is referred to by initials.

can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).[2]

## II. Background

Prior to her ninth birthday and before entering the 4th grade, KD was hospitalized at Fletcher Allen Healthcare (T. 245-304, 366), and was diagnosed with herpes simplex virus ("HSV") encephalitis.[3] (T. 249). A twenty-one day course of inpatient anti-viral medication was initiated as well as seizure medication. (*Id.*). A nasogastric feeding tube was inserted in KD's nostril. (*Id.*).

On August 6, 2010, KD transferred to Sunnyview Rehabilitation Hospital and participated in a rehabilitation program. (T. 180, 365-66). Her feeding tube was discontinued, as she began tolerating a regular diet. (T. 366). KD's discharge assessment on August 20, 2010. indicated that she still needed supervision for bathing and dressing, and she was walking with "contact guard assist of 1," wherein the physical therapist needs to merely have one or two hands on KD's body but provides no other assistance. (T. 365). Her discharge plan included referrals to physical, occupational, and speech therapy as well as an

---

[2] When reviewing acts of administrative agencies, courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

[3] Herpes simplex encephalitis (HSE) is a rare neurological disorder characterized by inflammation of the brain (encephalitis). Common symptoms include headaches, fevers, drowsiness, hyperactivity, and/or general weakness. The disorder may have some symptoms similar to those associated with meningitis, such as a stiff neck, altered reflexes, confusion, and/or speech abnormalities. Skin lesions usually are not found in association with herpes simplex encephalitis. Herpes simplex encephalitis is caused by a virus known as herpes simplex virus (HSV). *See WebMD, Encephalitis, Herpes Simplex*, http://www.webmd.com/brain/encephalitis-herpes-simplex (last viewed on June 20, 2014).

appointment with a psychologist (T. 365-66, 434), but she had none until returning to school in mid-October 2010. There, she received speech therapy, and also was evaluated for physical and occupational therapy, but it was determined they were not needed. (T. 316-17).

In January 2011, Cudworth applied in KD's behalf for disability-based supplemental security income benefits. (T. 10, 105-110). Cudworth alleged disability beginning on August 26, 2010, due to herpes meningitis, memory loss, and speech, language, and comprehension delays. (T. 131).

### III. Commissioner's Decision

KD's case was assigned to administrative law judge Carl E. Stephan ("ALJ Stephan"), who conducted an evidentiary hearing. (T. 10, 31-56). Cudworth and KD appeared, along with counsel. (*Id.*). ALJ Stephan received into evidence (a) testimony from Cudworth and KD, (b) forensic reports from state agency consultants, and (c) KD's medical and school records. (*Id.*).

The Supplemental Security Income ("SSI") program provides that an individual under the age of 18 may receive benefits when she has a medically determinable mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).[4] To determine child-benefits eligibility, the Commissioner applies a sequential and conjunctive threefold analysis described

_____

[4] "The purpose of providing SSI benefits to minor children is to provide benefits to children while they are children, thus enabling them as 'among the most disadvantaged of all Americans,' to enter society as 'self-supporting members.'" *Maldonado v. Apfel*, 55 F. Supp.2d 296, 307 (S.D.N.Y. 1999) (quoting H.R.Rep. No. 92-231 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5133-34).

below.[5] ALJ Stephan made findings favorable to KD at Steps 1 and 2, but found at Step 3 that KD does not have an impairment or combination of impairments that meets, medically equals or functionally equals the regulatory disability listing for mental retardation.[6] (T. 13). Consequently, ALJ Stephan concluded that KD was not disabled. (T. 26).

The Appeals Council denied Cudworth's request to review; Cudworth timely instituted this case, represented by counsel.

## IV. Points of Alleged Error

Cudworth's brief presents the following rhetorical questions which Cudworth advocates as meriting affirmative answers:

1. Was Plaintiff disabled pursuant to the guidelines for SSI for children?

2. Did the ALJ violate the treating source rule by not crediting the opinions of the treating sources?

3. Did the ALJ err by discrediting the testimony of Plaintiff's mother?

(Dkt. No. 11, p. i).

---

[5] Eligibility standards for SSI child benefits are as follows:

First, the ALJ considers whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). Second, the ALJ considers whether the child has a "medically determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." Id. § 416.924(C). Finally, if the ALJ finds a severe impairment, he or she must then consider whether the impairment "medically equals" or, ... "functionally equals" a disability listed in the regulatory "Listing of Impairments." Id. § 416.924(c)-(d).

Miller v. Commissioner of Soc. Sec., 409 Fed. App'x 384, 386 (2d Cir. 2010) (summary order) (quoting Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004)).

[6] The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. See 20 C.F.R. § 416.920(a)(4)(iii), (d). The mental retardation listing is in Section 112.05.

# V. First Point: *Is KD Disabled?*

Cudworth's entire argument on this point consists of only two conclusory sentences:

> In this instant case, based upon the medical records and the credible testimony of her mother, [KD] suffers from marked limitations in acquiring and using information; in attending to and completing tasks; and [i]nteracting and relating with others; and caring for herself. Wherefore, she is disabled as a matter of fact and law.

(Dkt. No. 11, p. 17).

At best, this unconventional approach to demonstrating evidentiary error is misdirected.[7] The governing circuit court of appeals recently explained that "whether there is substantial evidence supporting the [claimant]'s view is not the question." *Bonet ex rel. T.B. v. Colvin*, 532 Fed. App'x 58, 59 (2d Cir. 2013) (summary order). Rather, the court "must decide whether substantial evidence supports *the ALJ's decision*." *Id.* (emphasis in original). "Under this 'very deferential standard of review,' even where the record contains substantial evidence weighing against the Commissioner's findings, the court will not disturb the determination so long as substantial evidence also supports it." *Hart v. Colvin*, No. 12–CV–1043–JTC, 2014 WL 916747, at *5 (W.D.N.Y. Mar. 10, 2014) (citing *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *Marquez v. Colvin*, No. 12 Civ. 6819(PKC), 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013)).

"Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978);

---

[7] At worst, it is an nervy invitation for the court to exceed its narrow authority by reweighing evidence and coming to a different conclusion.

*Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004). Cudworth's irregular approach, *i.e.*, pointing only to favorable evidence, can succeed only if there is no contrary evidence a reasonable mind might accept as adequate to establish the factual findings made by ALJ Stephan. It requires a showing of either a total lack of evidence supporting those findings, or a showing that evidence supporting Cudworth's view is so overwhelming, while evidence to the contrary is so sparse, weak or incredible, that a finding based thereon is patently unreasonable.

Cudworth makes no such showing, and independent review of ALJ Stephan's decision reflects that more than a scintilla of competent and substantial evidence supports each factual determination.[8] This point of error, therefore, fails.

## VI. Second Point: *Adequacy and Consideration of Medical Evidence*

Cudworth's second point initially appears to raise a narrow issue of whether ALJ Stephan erred in failing to comply with a "treating source rule" (discussed *infra*). As *argued*, however, Cudworth's second point is a multi-faceted, scattergun challenge to ALJ Stephan's development and weighting of medical evidence. Consequently, discussion and analysis of Cudworth's second point are segmented for clarity. Threshold, ancillary issues are addressed here; the core "treating source rule" argument is examined in Section VII, *infra*.

---

[8]     Such evidence is identified adequately in ALJ Stephan's decision, and is recapped in the Commissioner's brief. It is unnecessary to review it further because Cudworth does not suggest that there was a total lack of evidence supporting ALJ Stephan's decision, but argues, instead, that unique Social Security rules required ALJ Stephan to accept conflicting and more favorable evidence. Those arguments are addressed in subsequent portions of this report.

*A.    Adequacy of Record*

With respect to KD's functional limitations, ALJ Stephan elected to give little weight to the  medical opinions of psychologist Andrew M. Hess, Ph.D., regarding KD's functional limitations. (T. 18).  Additionally, he did not state any specific weight afforded to evidence received from a psychiatrist (Dr. David Hedden, M.D.), a therapist (Meghan Lannon, LMSW), a nurse practitioner (Ellie Mills, RN, MS, NPP), and a treating pediatrician (Dr. Heidi Moore, M.D.).

Cudworth argues that each person listed above was a treating medical source whose opinions presumptively are entitled to controlling weight.  Thus, in Cudworth's view, ALJ Stephan was "obliged to obtain further information or clarification from the treating sources before discrediting their findings and opinions." (Dkt. No. 11, p. 30).  Cudworth again offers no substantive argument supporting this assertion.

Disability claimants undoubtedly possess a right to administrative records adequately developed to the point that fair and informed decisions can be reached thereon.[9]  Thus, administrative law judges must recontact treating physicians or other medical sources, and request additional information when evidence in hand is inadequate to determine whether claimants are disabled. 20 C.F.R. § 416.912(e); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information).  And, when further information is necessary, administrative law judges must first recontact treating sources.  *See*

---

[9]    In the Social Security context, the concept of an adequate record is *sui generis*.  "Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009) (internal quotation marks omitted). "It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* (internal quotation marks omitted); *accord Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

20 C.F.R. § 416.912(e); *Devora v. Barnhart*, 205 F. Supp.2d 164, 174 (S.D.N.Y. 2002) (collecting cases).

An administrative law judge's failure to develop the record adequately is an independent ground for vacating the Commissioner's decision. *See Moran*, 569 F.3d at 114-15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."). This affirmative obligation to develop an administrative record does not extend to infinity, however, and is not without limit. *See Guile v. Barnhart*, No. 5:07-cv-259 (GLS), 2010 WL 2516586, at *3 (N.D.N.Y. June 14, 2010). Further development is unnecessary, and administrative law judges may make determinations based upon existing evidence when it is consistent and sufficient to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920b(a). Reviewing courts agree that administrative law judges are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270 (DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

Here, there were no gaps in the record triggering a duty to recontact treating sources or further develop the record *sua sponte* through other sources. The record contained a complete medical history of KD, including hundreds of pages of treatment records, educational records, teacher questionnaire, and consultative reports. (T. 138-49, 179-306, 311-722). It was adequate to permit ALJ Stephan to make a disability determination. Hence, Cudworth's claim that ALJ Stephan was obligated *sua sponte* to recontact KD's treating medical sources lacks merit. *See Carvey v. Astrue*, 380 Fed. App'x 50, 52 (2d Cir. 2010) (summary order) (citing *Perez v. Chater*, 77 F.3d 41, 47-48 (2d Cir. 1996)).

*B.*    *Consideration of Entire Record; "Cherry Picking" of Evidence*

Cudworth argues that ALJ Stephan erred by failing to discuss treating-source opinions[10] of psychiatrist Hedden, therapist Lannon, and nurse practitioner Mills.    Cudworth further argues that ALJ Stephan improperly "cherry picked" evidence by relying on one portion of treating pediatrician Dr. Heidi Moore, M.D.'s report in support of a finding of no disability, but then discounting other portions of the very same report.    (Dkt. No. 11, pp. 27-30).

1.    <u>Heddon-Lannon-Mills Evidence</u>

Cudworth correctly points out that ALJ Stephan's decision contains no explicit discussion of evidence emanating from these sources.    The fact that an item of evidence is not *discussed* does not necessarily mean it was not *considered*.[11] And, since ALJ Stephan noted his duty to consider all relevant evidence (T. 14), a reviewing court cannot rationally conclude that he completely overlooked or deliberately ignored Heddon-Lannon-Mills evidence.

Moreover, an administrative law judge is not required to explicitly set forth every piece of evidence presented to him in his decision.    *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).    Thus, he need not cite and discuss treatment notes from all sources.    Such is especially the case when, as here, none of the Heddon-Lannon-Mills evidentiary sources provides evidence that would establish "medically meets" or "functionally equals" benchmarks of mental

---

[10]    Cudworth's brief argues at length that symptoms, diagnoses and prognoses recorded in treatment notes constitute "opinions." (Dkt. No. 11, p. 19).

[11]    *See Brault v. Social Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012) ("[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ "required to discuss every piece of evidence submitted.") (internal quotations and citation omitted); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

retardation listing 112.05 (discussed in Section VII, *infra*). An administrative law judge has no duty to provide a superfluous analysis of irrelevant evidence, nor is there a duty to discuss relevant evidence about which there is no conflict.

There is no basis to reverse the Commissioner's decision on this point.

2.   <u>Dr. Moore Evidence</u>

Cudworth claims that ALJ Stephan erred by relying on a portion of Dr. Moore's "report" in support of his finding of no disability but then discounting other portions of the same report. (Dkt. No. 11, p. 28). Administrative law judges cannot pick and choose only evidence that supports their particular conclusions. *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988)(citing *Fiorello v. Heckler*, 725 F.2d 174, 175–76 (2d Cir. 1983)). In other words, an administrative law judge may not "cherry-pick" medical opinions that support his or her opinion while ignoring opinions that do not. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). The rationale for this proscription is especially apparent with regard to conflicting substantive detail from the same evidentiary source.

Here, ALJ Stephan referred to Dr. Moore's medical progress reports only as impugning Cudworth's subjective testimony. (T. 16). He noted that Dr. Moore's later treatment notes indicated improvement and other causes for KD's symptoms.[12] Otherwise, ALJ Stephan did not weight Dr. Moore's evidence *per se* when assessing functionality of KD, and, contrary to Cudworth's contention,

---

[12]   ALJ Stephan observed that in January 2011, Dr. Moore's notes reflected that KD was struggling to adjust to a "rather significant situational stressor." (T. 16). Dr. Moore reported that KD's mood "improved," and by March 25, 2011, KD was "talkative and happy." (T. 329-30). Dr. Moore's notes reflected by November 2011, with prescribed medication, Cudworth reported a "big difference." (T. 581). Similarly, Dr. Moore's treatment notes showed KD's headaches appeared more frequently in early 2011, but by November 2011, they were reportedly occurring intermittently. (T. 16-17).

he did not credit only unfavorable portions of Dr. Moore's treatment notes while discounting parts, if any, that might support disability.

## VII.  Second Point: *Weighting of Treating Source Opinion*

Medical opinion evidence most favorable to KD came from psychologist Dr. Hess, who treated KD for a discrete period  in 2010 and early 2011 following her herpes encephalitis illness.  Dr. Hess provided a forensic opinion noting KD's "marked" restriction for her  ability to understand and remember complex instructions and  ability to carry out complex instructions.  (T. 720).    Had ALJ Stephan fully credited this opinion, he might have granted Cudworth's application on the "functionally equals" prong of mental retardation listing 112.05 (described *infra).*  But, because he considered it internally inconsistent with Dr. Hess's own clinical findings during his "neuropsychological evaluation," with other medical opinions, and with observations of KD's 4th grade school teacher ("Ms. Erwin")[13] who "had far more opportunities to observe the claimant on a day-to-day basis, making her intimately familiar with claimant's abilities and limitations," ALJ Stephan, gave "little weight" to Dr. Hess's opinion (T. 18).

ALJ Stephan elected, instead, to give "great weight" to forensic opinions expressed by another psychologist, Dr. Alan Dubro, Ph.D., who conducted an in-person, consultative psychiatric evaluation that resulted in benign findings.  He also afforded great weight to opinions from state agency consultative specialists in pediatrics and psychology who, after reviewing KD's longitudinal medical record, both found that KD has less-than-marked or no limitations in each of the six "domains" under the "functionally equals" prong of mental retardation listing 112.05.

---

[13]     The teacher's first name is not discernible, as the questionnaire completed by Ms. Erwin on February 28, 2011, was signed in cursive and, upon reproduction, is illegible.  (T. 147).

## A.    *Listing 112.05 (Mental Retardation)*[14]

Cudworth's challenge to ALJ Stephan's weighting of the medical evidence must be considered in the specific context of the mental retardation listing.[15] As mentioned earlier (fn. 5), a child is disabled when her impairment "medically equals" or "functionally equals" a disability listed in the regulatory "Listing of Impairments."

To *medically equal* this listing, a child must have an impairment "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning," and also fulfill requirements of one of six additional criteria listed under § 112.05(A)-(F).[16]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05.  To qualify, evidence must first contain a competent *medical diagnosis* that a child has "significantly subaverage general intellectual functioning with deficits in adaptive functioning."[17]    Next, evidence must show

---

[14]    The 2013 version of the Listing of Impairments replaced the term "Mental Retardation" with "Intellectual Disability." Compare 20 C.F.R. § 404, Subpt. P, App. 1, § 112.05 (2013) with *id.* (2012).

[15]    Cudworth does not dispute ALJ Stephan's conclusion that the mental retardation listing is the most relevant to KD's impairment.

[16]    These criteria are: (A) a child between the ages of 3 and 18 who meets at least two appropriate age-group criteria in paragraph B2 of Listing 112.02; (B) mental incapacity evidenced by dependence upon others for personal needs (grossly in excess of age-appropriate dependence) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded; (C) a valid verbal, performance, or full scale IQ of 59 or less; (D) a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function; (E) a valid verbal, performance, or full scale IQ of 60 through 70 and, for a child between the ages of 3 and 18, meeting requirements in at least one of several specified paragraphs of Listing 112.02; or (F) for a child between the ages of 3 and 18, satisfaction of Listing 112.02B2a, and a physical or other mental impairment imposing an additional and significant limitation of function. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05(A)-(F).

[17]    To establish this diagnostic requirement, a claimant may use a verbal, performance, or full scale IQ of 60 through 70 or " 'marked' limitation in the area of cognition/communication (under Listing 112.05F). *See Pimental v. Barnhart*, No. 04 Civ. 3769, 2006 WL 2013015, at *13–14 (S.D.N.Y. July 19, 2006) (quoting SSR 98-1p, Title XVI: Determining Medical Equivalence in Childhood Disability Claims When A Child Has Marked Limitations in Cognition and Speech, 63 Fed. Reg. 15248, 15250 (Mar. 20, 1998)).

that the child meets one of the criteria in paragraphs (A), (B), (C), (D), (E), or (F) of § 112.05.  *See* note 16, *supra*.

When assessing whether a child's impairment *functionally equals* the listing, adjudicators considers how a child functions in everyday-life activities segregated for analytical purposes into "domains" delineating "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).[18] To demonstrate functional equivalence, a claimant must have *marked* limitations in two domains or an *extreme* limitation[19] in one of the following six domains:  (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and physical well-being.  *See* 20 C.F.R. § 416.926a(b)(1)(i)-(vi); *see also Frye ex rel. A.O. v. Astrue*, 485 Fed. App'x 484, 487 (2d Cir. 2012).

## B.    Findings

ALJ Stephan found that KD does not meet or medically equal the diagnostic requirement of listing 112.05.[20] (T. 13).  As for functional equivalence,

---

[18]    Social Security Ruling (SSR) 09-1p directs administrative law judges to employ a "whole child" approach.  This requires administrative law judges to consider a child's everyday activities, determine all domains involved in performing them, consider whether that child's medically determinable impairment accounts for limitations in activities, and determine what degree such impairment limits that child's ability to function age-appropriately in each domain.  SSR 09-1p, TITLE XVI: DETERMINING CHILDHOOD DISABILITY UNDER THE FUNCTIONAL EQUIVALENCE RULE—THE "WHOLE CHILD" APPROACH, 2009 WL 396031, at *2-3 (S.S.A. Feb. 17, 2009).

[19]    A "marked" limitation interferes seriously with ability to independently initiate, sustain, or complete activities.  *See* 20 C.F.R. § 416.926a(e)(2)(i).  An "extreme" limitation means "more than marked," and represents an impairment which "interferes very seriously with . . . ability to independently initiate, sustain, or complete activities," and this rating is only "give[n] to the worst limitations." 20 C.F.R. § 416.926a(e)(3).

[20]    ALJ Stephan articulated this finding, in part, as follows:

There is no verbal performance, or full scale IQ score below 70 in the record.  Therefore, claimant's impairment does not meet or medically equal the severity of listing 112.05.

(T. 13).

ALJ Stephan made specific findings with regard to each of the six domains of functioning. (T. 18-26). He found that KD has *no* limitations with respect to domains 2, 3, 4, and 5 and *less than marked* deficits in the remaining two domains (acquiring and using information (domain 1) and health and physical well-being (domain 6). (T. 19-20, 25-26). Consequently, KD's application failed to meet the evidentiary burden required under Step 3 of the sequential and conjunctive test for child benefits eligibility.

## C. *Cudworth's Challenge*

Cudworth does not challenge ALJ Stephan's finding that KD does not satisfy the meet-or-medically-equal prong of listing 112.05.[21] But, with respect to functional equivalence findings, Cudworth argues that ALJ Stephan erred by failing to abide by the "treating source rule." Cudworth maintains that ALJ Stephan violated that rule by (a) giving little weight to the opinions of her psychologist, Dr. Hess,[22] (b) giving no weight (one way or the other) to opinions

---

[21]     Uncontradicted evidence demonstrates that KD does not have sub-average intellectual functioning. Intelligence testing indicates that KD functions in the low-average range. On the Wechsler Intelligence Scale for Children-IV edition ("WISC-IV"), KD achieved verbal, performance, and full scale IQ of 85, 92, and 89, respectively. (T. 338-39). Another report revealed that on the full WISC-IV, KD's full scale IQ score was 96, which was in the average range. (T. 712). Further on the Wechsler Abbreviated Scale of Intelligence ("WASI"), KD yielded a verbal IQ score of 88, and a performance score of 109. (T. 712-13). These score are considerably higher than those required to meet a childhood listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05.

[22]     In a medical source statement dated March 1, 2012, Dr. Hess noted "moderate" restriction in KD's ability to understand and remember simple instructions, and "marked" restriction in KD's ability to understand, remember, and carry out complex instructions. (T. 720).

of psychiatrist, Dr. Hedden,[23] therapist Lannon,[24] and nurse Mills[25] (who Cudworth views as treating sources), and (c) by failing to consider evidence from treating pediatrician Dr. Moore. (Dkt. No. 11, pp. 28-30).

Correlatively, Cudworth argues that ALJ Stephan further erred by giving great weight to opinions of consultative examining psychologist, Dr. Dubro, because he "had no treating relationship, did not review any of the other psychiatric records, and only did a cursory exam," and to nontreating, non examining pediatrics and psychology consultants, Dr. Bostic and Dr. Herrick, because their opinions "are not entitled to *any* weight" and "cannot in themselves constitute substantial evidence . . . ." (Dkt. No. 11, p. 30) (emphasis in original).

## D.    *Governing Legal Principles*

Administrative law judges must give controlling weight to opinions of "treating sources"[26] regarding the nature and severity of impairments, provided

---

[23]    In November 2011, KD met with Dr. Hedden for a medication reevaluation. (T. 619). During the appointment, Dr. Hedden opined that KD "appears to suffer from general mental status changes secondary to a serious brain infection." (T. 620). Dr. Hedden recommended that KD continue with Risperdal and family counseling with Meghan Lannon. (*Id.*). He further opined that KD may benefit from an additional services at school. (*Id.*).

[24]    In January 2012, therapist Lannon treated KD and noted that KD had disturbance of "emotional control," "behavioral control," and "risk status." (T. 628-30).

[25]    In September 2011, nurse Mills assessed KD as having a mood disorder, and recorded that KD appeared to be suffering from an episode of meningitis which sometimes mimics bipolar symptoms. (T. 626). She further noted KD was inappropriately, excessively interested in sex, had difficulty with concentration, focus and impulsivity, and experienced mood changes frequently. (*Id.*). Nurse Mills recommended stopping the medication Paxil due to its tendency to cause manic symptoms. (*Id.*).

[26]    *See* 20 C.F.R. § 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 416.927(c)(2). But, when treating source opinion swims upstream, contradicting other substantial evidence, such as opinions of other medical experts, it may not be entitled to controlling weight. *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643–44 (2d Cir. 2007) (summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Likewise, treating physician opinion may be discounted when it is internally inconsistent. *See Micheli v. Astrue*, 501 Fed. App'x 26, 28 (2d Cir. 2012) (summary order).

When controlling weight is not afforded to treating source opinion, and also when opinions from other acceptable medical sources are evaluated with respect to severity of impairments and how they affect individuals' ability to function, the degree of weight to be given such evidence is determined by applying certain generic factors prescribed by regulation: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other significant factors. *See* 20 C.F.R. § 416.927(c).

E. *Application*

1. <u>Hedden, Lannon, Mills Evidence</u>

Cudworth's argument regarding ALJ Stephan's claimed failure to consider and appropriately weigh evidence from Dr. Hedden, therapist Lannon, and nurse Mills was addressed and rejected, *supra*, at VII(B). It is unnecessary to repeat that analysis except to note again that none of it addresses whether KD has

marked limitations in two equivalence domains or an extreme limitation in at least one.

2.  Dr. Moore

Cudworth's argument regarding failure to consider evidence from Dr. Moore is unsupported by the evidentiary record. Contrary to Cudworth's contention, ALJ Stephan did consider treatment notes from Dr. Moore that indicated that KD appeared to struggle with anxiety and depression in early 2011 due, at least in part, to her father's incarceration, but that KD had improved in late March 2011. (T. 16). Additionally, ALJ Stephan noted that Dr. Moore's treatment notes reflected in November 2011 that a medication change had made a big difference in KD's behavior. (*Id*.). And, more importantly, Cudworth points to nothing in Dr. Moore's evidence that would establish that KD has marked limitations in two equivalence domains or an extreme limitation in at least one, even if fully credited.

3.  Dr. Hess

ALJ Stephan also did not err in affording Dr. Hess's opinions little weight rather than controlling weight. ALJ Stephan cited the applicable regulation thus indicating his awareness of and intent to follow it. (T. 18). ALJ Stephen observed that Dr. Hess, a licensed psychologist, treated KD for a period of time after her illness in 2010 and early 2011 (Factors 1 and 5). ALJ Stephan explained that the severity of limitations opined by Dr. Hess in his 2012 medical source statement were not supported by the record, including his own evaluation

of KD (Factors 3, 4 and 6).[27] (T. 18). Additionally, ALJ Stephan noted that Dr. Hess's restrictive opinion was contradicted by KD's teacher, Ms. Erwin, who found that KD had no problems in the domain of attending and completing tasks (Factors 3, 4, and 6). (T. 18). Ms. Erwin observed no limitations in KD's ability to perform multi-step instructions and only a slight problem comprehending oral instructions. (T. 141-42). ALJ Stephan reasonably concluded that KD's teacher had far more opportunities to observe KD on a day-to-day basis. (T. 18).

This constituted an adequate regulatory-factor analysis, and under this circumstance, ALJ Stephan properly could elect to give little weight to treating source opinion.

### 4. Consultative Evidence

ALJ Stephan also did not err when electing to give weight to opinions of consultative medical sources. State agency medical consultants are recognized experts in evaluation of medical issues in disability claims under the Act. *See* 20 C.F.R. § 416.927(e)(2)(i), and, as such, their opinions can be given weight. While both the Commissioner and reviewing courts acknowledge that treating source opinion presumptively is entitled to controlling weight, consultative opinions can be afforded greater weight than treating-source physicians when there is good reason to reject treating source opinion and substantial evidence supports consultative opinions. *See, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (summary order) (reports of consultative doctors and/or

---

[27] In a medical source statement dated March 1, 2012, Dr. Hess opined that KD had "moderate" restriction in understanding, remembering, and carrying out simple instructions, and "marked" restriction in understanding, remembering, and carrying out complex instructions. (T. 720). But, in his earlier non-forensic neuropsychological evaluation report dated January 7, 2011, Dr. Hess found that KD displayed "average intellectual ability," and performed "well" in nonverbal reasoning and visual memory, as well as basic attention. (T. 715).

non-examining physicians may override opinions of treating physicians when supported by substantial evidence). Here, all consultative medical opinions came from subject-matter specialists (Factor 5); their opinions were more consistent with KD's medical treatment record as a whole (Factor 4), and also were consistent with daily observations accounted for by KD's teacher, Ms. Erwin, in her questionnaire responses (Factor 6).

ALJ Stephan neither violated the governing regulation nor exceeded bounds of his wide discretion when deciding to give little weight to treating source opinion and greater weight to consultative opinions. Accordingly, he did not err in weighting medical opinions, and Cudworth's second point of error fails.

## VIII.   Third Point: *Weighting of Subjective Testimony*

ALJ Stephan summarized Cudworth's subjective testimony at length over the course of three single-spaced, small-font pages in his written decision. (T. 14-16). Essentially, Cudworth testified that KD was a healthy, normal child prior to her HSV encephalitis illness, but that the illness changed her, causing her to become disabled. Under questioning, Cudworth elaborated on specific manifestations of that perceived change as they relate to each of the functional-equivalence domains of mental retardation listing 112.05.

Had ALJ Stephan fully credited that testimony, he might have had an adequate evidentiary basis for finding KD disabled. But, based on (a) conflicting evidence from KD, (b) conflicting evidence from KD's teacher, Ms. Erwin, (c) conflicting medical evidence from treating sources , Dr. Hess and Dr. Moore, and (d) all three consulting medical sources, ALJ Stephan concluded that Cudworth's subjective statements regarding intensity, persistence and limiting effects of KD's symptoms were not fully credible. (T. 16-17).

### 1. Cudworth's Challenge

Cudworth argues that ALJ Stephan erred by failing to assess her testimony in accordance with a regulation governing subjective credibility determinations. She argues also that ALJ erred by using KD's inherently unreliable testimony to impeach Cudworth, by improperly examining KD with suggestive, leading questions and by failing to ask Cudworth follow-up questions after KD testified. (Dkt. No. 11, p. 36).

### 2. Governing Legal Standards

Subjective testimony regarding persistence, intensity and limiting effects of symptoms is not only relevant, but desirable. On the other hand, it is subjective and may be colored by interest in obtaining a favorable outcome. An administrative law judge must, therefore, engage in a difficult task of deciding how much weight to give subjective self-evaluations.

#### a. *Commissioner's Protocol*

The Commissioner provides explicit guidance. First, a formally promulgated regulation requires consideration of seven objective factors that naturally support or impugn subjective testimony of disabling pain and other

symptoms.[28] Second, an interpretive ruling directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Governing circuit law generally mirrors the Commissioner's Ruling. Thus, when an administrative law judge rejects a claimant's testimony of pain and

---

[28] An administrative law judge must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including the following factors:

(i) claimant's daily activities;
(ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi) measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c).

limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). Otherwise, a reviewing court cannot subject a credibility determination to meaningful judicial review. *See Meadors v. Astrue*, 370 Fed. App'x 179, 184–85 (2d Cir. 2010).

### b. *Judicial Review of Subjective Credibility Determinations*

Absent flagrant disregard of governing law, nothing in social security jurisprudence is more firmly established than that it is the prerogative of the Commissioner, not reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by an administrative adjudicator. *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

### 3. Application

Cudworth's brief to the court cites the governing regulation mentioned above, but does not argue that ALJ Stephan violated it in any specific manner. Independent inquiry, moreover, does not disclose that ALJ Stephan failed to apply correct principles of law. ALJ Stephan acknowledged all regulations and rulings that govern consideration of subjective evidence, and he expressly referenced the two-step process for considering subjective symptoms. (T. 14).

*See Britt v. Astrue*, 486 Fed. App'x 161, 164 (2d Cir. 2012) (summary order) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96–7p as evidence that the administrative law judge used proper legal standard in assessing the claimant's credibility).

ALJ Stephan then considered objective factors identified in the regulation to the extent there was evidence thereof, engaged in the two-step process as required by the applicable ruling, and articulated specific reasons, all as required by circuit law. From an evidentiary standpoint, ALJ Stephan accurately observed that no medical evidence of record that he found credible demonstrates that KD has marked limitations in any of the six domains of functioning. (T. 18-26). ALJ Stephan properly could consider lack of confirming medical evidence when assessing Cudworth's subjective credibility.[29]

Cudworth's due process arguments, moreover, fail to demonstrate error. Cudworth was represented by counsel, who both questioned her at length regarding KD's limitations (T. 44-48), and was afforded an opportunity after both Cudworth and KD testified to examine them further. (T. 48, 55). Cudworth does not identify any specific area of testimony as to which ALJ Stephan prevented her from being heard in a meaningful manner, and independent review of the entire transcript fails to disclose a single instance thereof.

Cudworth's final complaint that ALJ Stephan acted improperly by asking only leading questions of KD, and by then impeaching Cudworth's testimony with KD's intrinsically unreliable answers also lacks merit. Pleasing an authority figure such as ALJ Stephan through inaccurate, dissembling testimony could be a symptom of KD's impairments, but it is sheer speculation

---

[29]    Subjective assertions alone cannot ground a finding of disability. 20 C.F.R. § 416.929(a).

to assume that KD's testimony was a sham for that reason. Moreover, independent review fails to disclose that ALJ Stephan was so overbearing or suggestive as to warrant a conclusion that he coaxed impeaching testimony from KD. Many of his questions were open-ended, such that KD was free to state whatever she wanted. (T. 48-55). And, while some questions put to KD were leading, that fact, alone, does not evidence error.[30] Finally, while ALJ Stephan might have conducted a more penetrating examination on some of the points he found probative for impeachment (*e.g.,* when KD testified that she had "lots" of friends, asking her to name some and state how often she goes to their houses to play), reviewing courts do not expect or demand perfection in administrative proceedings.

In sum, ALJ Stephan's subjective credibility choice was reached and explained sufficiently, and is not reversible for failure to apply correct principles of law or for lack of substantial evidence.

## IX. Recommendation

The Commissioner's decision should be AFFIRMED, and Cudworth's request to remand this action should be DENIED.

## X. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

---

[30] "[S]trict rules of evidence, applicable in the courtroom, are not to operate at social security hearings ...." *Richardson*, 402 U.S. at 400-01; *accord Brault*, 683 F.2d at 449; *see also Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___20___ day of _____June_____ 2014.

_____

Earl S. Hines
United States Magistrate Judge